Andrea Fischer (*Pro Hac Vice* pending) (FL Bar #1000345)
Audrey Schechter (*Pro Hac Vice* pending) (FL Bar #962589)
FISCHER LEGAL GROUP
305 Broadway, Suite 742
New York, NY 10007
Tel: (212) 328 0142
Email: afischer@fischerlegalgroup.com; audreyschechterlaw@gmail.com

Nicholas A. Verderame (*Pro Hac Vice* pending) (AZ Bar #030683)
PLATTNER VERDERAME, PC
316 E. Flower St.
Phoenix, AZ 85020
Tel: (602) 266-2002
E-Mail: NVerderame@PVAzLaw.com

Emily A. Nugent (SBN 255048)
EMILY NUGENT LAW
935 Moraga Road, Suite 200
Lafayette, CA 94549
Tel: (510) 371-4456
E-Mail: emily@emilynugentlaw.com

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the States of Alaska, California, and Nevada, *ex rel.* KELVIN CHRIS STANGER and JOHN HURST,<br><br>Plaintiffs/Relators,<br><br>v.<br><br>HCA HOLDINGS, INC., HCA HEALTHCARE, INC., ALASKA REGIONAL HOSPITAL, LAKEVIEW HOSPITAL, HCA MOUNTAIN DIVISION, HCA FAR WEST DIVISION, HEALTHTRUST, CERECORE f/k/a PARALLON TECHNOLOGY SOLUTIONS, MITCHELL TIBBITTS, JILL BIRDSONG, MICHAEL HALE, KIM CHRISTENSEN, and TINA MILLER.<br><br>Defendants. | Case No. **CV21 2716 TSH**<br><br>**COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b),** *et seq.*<br><br>**JURY TRIAL DEMANDED** |

1

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

Plaintiffs, the United States of America and the States of Alaska, California, and Nevada, *ex rel.* Kelvin Chris Stanger and John Hurst, by and through relators' attorneys, allege for their *qui tam* complaint against HCA Holdings, Inc., HCA Healthcare, Inc., Alaska Regional Hospital, Lakeview Hospital, HCA Mountain Division, HCA Far West Division, Health Trust, CereCore f/k/a Parallon Technology Solutions, Mitchell Tibbitts, Jill Birdsong, Michael Hale, Kim Christensen, and Tina Miller, as follows:

## PRELIMINARY STATEMENT AND NATURE OF THE ACTION

1)     This is a civil action brought by relators Kelvin Chris Stanger ("Stanger") and John Hurst ("Hurst") (collectively, Stanger and Hurst are known as "Relators") on their own behalves and on behalf of the United States of America ("United States") under 31 U.S.C. §§ 3729 *et seq.* (the "Federal False Claims Act" or the "FCA"), and on behalf of the States of Alaska, California, and Nevada, under the Alaska Medical Assistance False Claim And Reporting Act, AK ST § 09.58.010 ("Alaska False Claims Act" or Alaska FCA)", the California False Claims Act, Government Code Sections 12650-12656 ("California FCA" or "California False Claims Act"), the California Insurance Claims Fraud Prevention Act (the "California Private Act"), and the Nevada False Claims Act, NRS  357 ("Nevada FCA" or "Nevada False Claims Act"), to recover damages sustained by, and penalties owed to the Plaintiffs against HCA Holdings, Inc. ("Holdings"), HCA Healthcare, Inc. ("HCA"), Alaska Regional Hospital ("Alaska Regional"), Lakeview Hospital ("Lakeview"), HCA Mountain Division ('Mountain"), HCA Far West Division ("Far West"), HealthTrust ("Trust"), CereCore f/k/a Parallon Technology Solutions ("CereCore") (collectively, Holdings, HCA, Alaska Regional, Lakeview, Mountain, Far West, Health Trust, and CereCore are known as "Corporate Defendants"), and Mitchell Tibbitts ("Tibbitts"), Jill Birdsong ("Birdsong"), Michael Hale ("Hale"), Kim Christensen

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

("Christensen"), and Tina Miller ("Miller") ("collectively Tibbitts, Birdsong, Hale, Christensen, and Miller are known as "Individual Defendants") (collectively, Corporate Defendants and Individual Defendants are known as "Defendants") as a result of Defendants grossly overcharging the government for medical supplies used, as well as patient harm based on the inability to accurately track which items medical providers placed inside of each patient. Both Relators Stanger and Hurst became aware of a systemic problem within HCA's Supply Chain (defined below at IV. 4), failing to maintain accurate data pertaining to what medical items were used, what items were placed into which patient, and what the hospital paid for each item, as well as significantly overcharging patients/payors for each item. Additionally, HCA received rebates on medical items they bought in bulk. HCA, however, never accounted for these rebates when inventorying the products for billing the government, insurance companies and patients.

## I.   **JURISDICTION AND VENUE**

2)      This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

3)      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in and transact business in this District. In addition, the acts prohibited by 31 U.S.C. § 3729 occurred in this District.

4)      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

5)      To the extent that there has been a public disclosure unknown to the Relators, they are the "original source" under 31 U.S.C. § 3730(e)(4). Relators have direct and independent

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

knowledge of the information on which the allegations are based and have voluntarily provided the information to the Government before filing this *qui tam* action based on that information.

## II.   **PARTIES**

6)   Plaintiffs are the United States of America, on behalf of its agencies the United States Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), and the States of Alaska, California, and Nevada.

7)   Relator Kelvin Chris Stanger is a citizen of the United States, who resides in Sierra Vista, Arizona.  At all relevant times herein, Stanger was an employee of Corporate Defendants, as controller of Alaska Regional and Lakeview.

8)   Relator John Hurst is a citizen of the United States and resides in Sierra Vista, Arizona.  At all relevant times herein, Hurst was an employee of the Corporate Defendants as Supply Chain director for Alaska Regional.

9)   Corporate Defendant Holdings is the parent of HCA.

10)   Corporate Defendant HCA is a Delaware corporation that is a for-profit operator of healthcare facilities and is doing business throughout the United States.  HCA's common stock is traded on the New York Stock Exchange under the symbol HCA.

11)   Organizationally, HCA is split into 16 divisions, with 15 divisions in the United States of America, and the HCA International Division in the United Kingdom.  HCA hospitals are grouped into divisions which are loosely based on geography ("Division").

12)   Hospital operations are organized and managed by Divisions.

13)   HCA financial services are managed at the hospital level and report to the hospital CFO and up to the Division controller and Division CFO.

---

4

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

14)     Supply chain management is sometimes aligned with more than one hospital's Division.

15)     Corporate Defendant Alaska Regional is an HCA hospital located in Anchorage, Alaska.

16)     Alaska Regional's supply chain is managed by the combined Mountain and Far West Divisions.

17)     Corporate Defendant Lakeview is an HCA hospital located in Bountiful, Utah.

18)     Corporate Defendant Mountain is an HCA Division that oversees HCA hospitals in: Anchorage, Alaska; Idaho Falls, Idaho; Caldwell, Idaho Brigham City, Utah; North Logan, Utah; Bountiful, Utah; Draper, Utah; Payson, Utah; Ogden, Utah; Salt Lake City, Utah; and Orem, Utah.

19)     Corporate Defendant Far West is an HCA Division that oversees HCA hospitals in San Jose, California, Thousand Oaks, California, and Las Vegas, Nevada.

20)     Corporate Defendant Trust is a limited partnership that is a wholly owned, indirect subsidiary of HCA.  HCA is the general partner of Trust.  Trust is a managed services provider that provides Supply Chain operations for HCA.

21)     Corporate Defendant CereCore is a wholly owned HCA subsidiary that provides electronic health records ("EHR") implementations, IT and application support, IT managed services, technical staffing, strategic IT consulting and advisory services to hospitals and health systems.

22)     Individual Defendant Tibbitt was the Mountain Division CFO.

23)     Individual Defendant Birdsong is the CFO at Alaska Regional.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

24)     Individual Defendant Hale was the Mountain Division Controller and is now CFO of Ogden Regional Hospital in Utah.

25)     Individual Defendant Christensen was a regional supply chain/logistic director at HCA at all relevant times herein.

26)     Individual Defendant Miller was the COO of Alaska Regional at all relevant times herein.

## III.   THE LAW

### a.  The False Claims Act

#### 1.     False Claims Act Fraud

27)     The False Claims Act, as amended, provides, in pertinent part, that:

> [A]ny person who (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $11,665 and not more than $23,331… plus 3 times the amount of damages which the Government sustains because of the act of that person.

28)     Fraud is knowingly and willfully executing, or attempting to execute, a scheme or artifice to defraud any health care benefit program or to obtain (by means of false or fraudulent pretenses, representations, or promises) any of the money or property owned by, or under the custody or control of, any health care benefit program. 18 U.S.C. § 1347.

29)     The term "knowingly" means that a person "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

Thus, "no proof of specific intent to defraud is required" to impose liability under the FCA. 31

U.S.C.§ 3729(b)(1)(B).

30)      The FCA also broadly defines a "claim" as "any request or demand, whether

under a contract or otherwise, for money or property which is made to a contractor, grantee, or

other recipient if the United States Government provides any portion of the money or property

which is requested or demanded, or if the Government will reimburse such contractor, grantee,

or other recipient for any portion of the money or property which is requested or demanded." 31

U.S.C. § 3729(b)(2).

31)      The FCA empowers private persons having information regarding a false or

fraudulent claim against the Government to bring an action on behalf of the Government and to

share in any recovery.  The complaint must be filed under seal without service on any

Defendants.  The complaint remains under seal while the Government conducts an investigation

of the allegations in the complaint and determines whether to intervene in the action.  31 U.S.C.

§ 3730(b).

### 2.      False Claims Act's Anti-Retaliation Provision

32)      The False Claims Act provides a cause of action for an employee or agent who is

discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated

against in the terms and conditions of employment because of lawful acts done by the employee,

in furtherance of a False Claims Act case, or other efforts to stop violations of the False Claims

Act. 31 USC §3730(h)(1).

33)      Pursuant to 31 USC §3730(h)(2), Plaintiff is entitled to two times the amount of

back pay, interest on the back pay, and compensation for any special damages sustained as a

7

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§
3730(b), *et seq.*

result of the discrimination, including litigation costs and reasonable attorneys' fees, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, damages for humiliation, mental anguish, and emotional distress, pre and post-judgment interest, litigation costs and attorneys' fees, and any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial. The False Claims Act provides a cause of action for an employee or agent who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, in furtherance of a False Claims Act case, or other efforts to stop violations of the False Claims Act. 31 USC §3730(h)(1).

### b.   Federal Government Health Programs

#### 1.   Medicare

34)   Medicare is a federal government-funded medical assistance program, primarily benefitting the elderly and the disabled, which was established in 1965 by Title XVIII of the Social Security Act.  *See* 42 U.S.C. §§ 1395 *et seq.*  Medicare is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), and formerly known as the Health Care Financing Administration ("HCFA"), which is a division of the U.S. Department of Health and Human Services ("HHS").

35)   Medicare was designed to be a health insurance program and to provide for payment of, among other things, medical services and equipment to persons over 65 years of age and certain others who qualify under Medicare's terms and conditions. The Medicare program has four parts: Part A, Part B, Part C and Part D.  Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

nursing facility care. *See* 42 U.S.C. §§ 1395c-1395i-4. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, such as services provided to Medicare patients by physicians, laboratories, and diagnostic testing facilities. See 42 U.S.C. §§ 1395k, 1395l, 1395x(s). Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

### 2. Medicaid

36)     Medicaid is a program that provides medical coverage to the needy, the blind, the disabled, and to needy families with dependent children. 42 U.S.C. §§ 1396-1396v. At the federal level, CMS administers Medicaid. All 49 states with Medicaid programs have a state Medicaid agency to administer its program.

37)     Payments for goods and services covered by Medicaid come from both federal and state funds (collectively referred to as "Medicaid Funds"), with the federal contribution computed separately for each state. 42 U.S.C. §§ 1396b; 1396d (b). Each state's obligation varies depending upon various factors, but generally ranges from 40-60% of the total payments within each state.

38)     Federal law authorizes the states to expend Medicaid funds on behalf of eligible beneficiaries to pay for, among other things: (a) drugs; (b) hospital services; and (c) physicians' services. 42 U.S.C. §§ 1396a (10) (A); 1396d (a) (xvii) (1), (2), (5) (A), (6), (9), (12), and (13).

### 3. TRICARE

39)     TRICARE is the healthcare system of the United States military, designed to maintain the health of active-duty service personnel, provide healthcare during military operations, and offer health care to non-active-duty beneficiaries, including dependents of active-

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

duty personnel and certain military retirees and their dependents. The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian healthcare providers. Five managed care support contractors create networks of civilian healthcare providers.

40) Whereas TRICARE treats active-duty military and their dependents, the Veterans Administration ("VA") provides healthcare and other benefits to military veterans through its nationwide network of hospitals and clinics.

### 4.   FEBHP

41) The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than 8 million federal employees, retirees, and their dependents. FEHBP is a collection of individual healthcare plans such as the Blue Cross and Blue Shield Association. The Office of Personnel Management manages the FEHBP plans.

### c.   Cost reporting

42) Medicare-certified institutional providers are required to submit an annual cost report to a Medicare Administrative Contractor (MAC). The cost report contains provider information such as facility characteristics, utilization data, cost and charges by cost center (in total and for Medicare), Medicare settlement data, and financial statement data. https://www.cms.gov/Research-Statistics-Data-and-Systems/Downloadable-Public-Use-Files/Cost-Reports

43) Form CMS 2552-10 is entitled "Hospital and Hospital Health Care Complex Cost Report Certification and Summary." The certification section provides:

> MISREPRESENTATION OR FALSIFICATION OF ANY
> INFORMATION CONTAINED IN THIS COST REPORT MAY BE

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by _____{Provider Name(s) and Number(s)}for the cost reporting period beginning _____ and ending _____ and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

**d.      Supply chain regulations**

44)     In September 2013, the FDA enacted 78 FR 58785, the final rule pertaining to Unique Device Identifiers ("UDIs") for all medical devices, including stents.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

45) The "executive summary" of the rule notes: "By establishing a system for the adequate identification of medical devices through distribution and use, the rule will serve several important public health objectives" including: reducing medical errors; simplifying the integration of device use information into data systems; providing more rapid identification of medical devices with adverse reaction; providing more rapid development of solutions to reported problems; providing more rapid, more efficient resolution of device recalls; and better focused and more effective FDA communications.  78 FR 58785.

46) Inclusion of UDI in the patient's EHRs will serve a further purpose, *to wit*, "strengthen the health care community's ability to identify the specific devices implanted into patients and … improve response to postmarket surveillance activities, including adverse event reporting and recalls." *Id.*

47) UDIs constitute a critical aspect of the Supply Chain system.  "New Regulations Emphasize Patient Safety in the Supply Chain" - Health Facilities Management, Dec. 2, 2015. https://www.hfmmagazine.com/articles/1828-new-regulations-emphasize-patient-safety-in-the-supply-chain CMS recognizes the importance of integrating the UDIs into patient records and hospital data analysis.

48) In October 2015, CMS enacted a "meaningful use" regulation, requiring "hospital EHR systems to include UDIs within the Common Clinical Data Sets (CCDS), which are a summary of key information on the patient such as immunizations and allergies." *Id.* Additionally, the regulation requires hospitals have the ability to parse the UDI data and link to the Food and Drug Administration ("FDA") UDI database.  Such linkage allows the FDA to surveil the devices post-market, imperative when a recall occurs. *Id.*

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

49)     The 2015 rule expands on the September 2014 FDA rule, requiring "manufacturers of Class III medical devices — such as stents and other high-risk implantable devices — to provide the UDI with each device. The FDA set up the global UDI database for device surveillance and post-market recalls." *Id.*

50)     21 CFR 821 sets forth the medical device tracking requirements and the implementation of section 519(e) of the Food, Drug and Cosmetic Act ("FDCA") (21 U.S.C. sec. 519 *et seq.*). In section 821.1, the regulation addresses the scope and purpose of the section. Specifically, the regulation states that the FDA established the UDI tracking system in order to monitor the placement of devices (in this instance, primarily stents) inside of a patient's body in case of adverse effects or recalls.

51)     21 CFR sec. 803.33 mandates every user facility submit an annual report (Form FDA 3419). The report must include the UDI for every reportable event. (21 CFR sec. 803.33(b)(7)(iv)).

52)     In "Medical Device Reporting for User Facilities[1]," HHS directs:

> A user facility must report to the device manufacturer and FDA whenever the facility has information that reasonably suggests a device has or may have caused or contributed to a patient's death. If a facility has information that reasonably suggests a device has or may have caused or contributed to a patient's serious injury, it must report this information to the device manufacturer. If the manufacturer is not known, the report should be sent to FDA.

Medical Device Reporting for User Facilities, sec. 2.1.

53)     HHS further directs:

> If any individual adverse event report was submitted during the previous 6-month reporting period, a user facility must submit a semiannual report

_____

[1] https://www.fda.gov/media/73972/download

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

to FDA on FDA Form 3419, or an approved electronic equivalent.
Semiannual reports are due by January 1 (for reports made July through
December) and by July 1 (for reports made January through June) of each
year.

*Id.*

54)   HHS describes "information that reasonably suggests" as:

Information that reasonably suggests that a medical device has caused or
contributed to a MDR reportable event (i.e., a death or serious injury)
includes any information such as professional, scientific, or medical facts
and observations or opinions that a device has caused or may have caused
or contributed to a reportable event.

*Id.*, sec. 2.5.

55)   CMS has issued requirements for participating in Medicaid incentive payments,

now referred to as Promoting Interoperability Programs ("Program").

https://www.cms.gov/Regulations-and-

Guidance/Legislation/EHRIncentivePrograms/DataAndReports  The Program's intent is to

increase medical data sharing and Public Health reporting.  https://www.cms.gov/Regulations-

and-

Guidance/Legislation/EHRIncentivePrograms/Downloads/PublicHealthReporting_Stage3_Medi

caidHospitals.pdf.  The Program also applies to Medicare and dually eligible hospitals (i.e.,

Medicare and Medicaid).  *Id.*

56)   The Program mandates that hospitals adhere to a minimum of four of the quality

measures set forth in the Program.  *Id.*  Those include: Immunization Registry reporting,

Syndromic Surveillance reporting, electronic case reporting, Public Health Registry reporting,

Clinical Data Registry reporting, and Electronic Reportable Laboratory Result reporting.  *Id.*

Some exclusions may apply.

14

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§
3730(b), *et seq.*

57)     Hospitals seeking payment under the Program must also demonstrate "active engagement" with a public health agency ("PHA") or a clinical data registry ("CDR"). *Id.* "Active engagement" means the provider is in the process of moving toward sending production data to a PHA or CDR.  "Production data" means data generated through clinical processes involving patient care." *Id.*

58)     The Program requires the providers to demonstrate "meaningful use" of the certified electronic health record technology, with the ultimate goal of improving health outcomes. https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/index?redirect=/ehrincentiveprograms.

59)     CMS states that "[i]n order to efficiently capture and share patient data, health care providers need an electronic health record (EHR) that stores data in a structured format. Structured data allows health care providers to easily retrieve and transfer patient information and use the EHR in ways that can aid patient care." https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/Certification.

60)     The submitted data includes cost reporting data.  Further, the cost reporting data provides the basis for calculating the payments under the Program. https://www.cms.gov/RegulationsandGuidance/Legislation/EHRIncentivePrograms/Downloads/MLN_TipSheet_MedicareHospitals.ppd.

**e.     State False Claims Acts**

**1.      Alaska False Claims Act, AS 09.58.010(a)**

61)     The Alaska False Claims Act is modeled on the Federal False Claims Act, and states, in pertinent part, that:

(a) A medical assistance provider or medical assistance recipient may not

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

(1) knowingly submit, authorize, or cause to be submitted to an officer or employee of the state a false or fraudulent claim for payment or approval under the medical assistance program; (2) knowingly make, use, or cause to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim for payment paid or approved by the state under the medical assistance program; (3) conspire to defraud the state by getting a false or fraudulent claim paid or approved under the medical assistance program; (4) knowingly make, use, or cause to be made or used, a false record or statement to conceal, avoid, increase, or decrease an obligation to pay or transmit money or property to the medical assistance program; (5) knowingly enter into an agreement, contract, or understanding with an officer or employee of the state for approval or payment of a claim under the medical assistance program knowing that the information in the agreement, contract, or understanding is false or fraudulent.

**2.     California False Claims Act,  California Government Code, Title 2, Div. 3, Part 2, Ch. 6, Article 9, Section 12651 *et seq.***

62)     The California False Claims Act is modeled on the Federal False Claims Act, and provides, in pertinent part, that:

(a) Any person who commits any of the following enumerated acts in this subdivision shall have violated this article and shall be liable to the state or to the political subdivision for three times the amount of damages that the state or political subdivision sustains because of the act of that person. A person who commits any of the following enumerated acts shall also be liable to the state or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and shall be liable to the state or political subdivision for a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) for each violation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Public Law 101–410 Section 5, 104 Stat. 891, note following 28 U.S.C. Section 2461.
(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.
(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.
(3) Conspires to commit a violation of this subdivision.
(4) Has possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and knowingly delivers or causes to be delivered less than all of that property.

16

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the state or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used.

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property.

(7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.

(8) Is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

### 3.      Nevada False Claims Act; Nev. Rev. Stat. § 357.040 (1)(a)-(i)

63)     The Nevada False Claims Act is modeled on the Federal False Claims Act, and imposes liability on any person who, in pertinent part:

a. Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval. b. Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim. c. Commits any of seven other kinds of fraudulent acts.

### f.      States EHR Incentive Payment Programs.

### 1.      Alaska Medicaid Incentive Payment Program (the "Alaska Program")

64)     The Alaska Program's Provider Manual provides compliance guidance to the providers seeking to benefit from the incentive programs. http://dhss.alaska.gov/HIT/Documents/EHRIncentiveProgramsProviderManual.pdf

65)     Unlike the federal Program which requires "meaningful usage" of the certified electronic health records program ("CEHRP") in the first year in order to receive incentive payments, the Alaska Program merely requires the provider adopt, implement or upgrade to a CEHRP.  http://dhss.alaska.gov/HIT/Documents/EHRIncentiveProgramsProviderManual.pdf, at

---

17

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

page 19. "Meaningful use" is the standard applied to subsequent years. *Id.* at 21-25 (setting forth the quality measures to which the Alaska providers must attest). The quality measures include patient electronic access to health care information, coordination of care through patient engagement, health information exchange, and public health and clinical data registry reporting.

66)     The Alaska Program application process includes the applying hospitals to submit their cost reports for the most recent four years. *Id.* at 34.

67)     The Alaska Program uses cost report data to calculate the payments under the Incentive Payment Program. State of Alaska, Department of Health and Social Services, "State Medicaid HIT Plan Update", page 84, section C26.2 (stating DHSS will leverage form CMS - 2552-96. Hospital Cost Reports and form CMS-2552-2010 Hospital Cost Reports as submitted to verify the information entered into the SLR [State Level Registry] by the hospital.").

http://dhss.alaska.gov/HIT/Documents/Alaska%20SMHP%202012016.pdf

68)     Thus, the eligible hospital cost reports impact the amount Alaska pays eligible hospitals under the Alaska Program.

### 2.     California Medicaid Incentive Payment Program

69)     California's incentive program is known as MedCal Promoting Interoperability Program (the "California Program").

70)     The California Program uses the CMS calculation process to determine payments to eligible hospitals.

https://www.dhcs.ca.gov/provgovpart/Documents/OHIT/CA_St_Medicaid_HIT_Plan_v3.0.pdf, page 156, section 3.6.2. Such analysis includes cost reporting data. *Id.*

71)     Thus, the eligible hospital cost reports impact the amount California pays eligible hospitals under the California Program.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

### 3. California Insurance Claims Fraud Prevention Act

72)     The California Insurance Fraud Prevention Act protects the interests of private insurance companies against fraudulent claims.

73)     The California Insurance Fraud Prevention Act is codified at Cal Ins. Code § 1871 – 1871.9 and is modeled after the False Claims Act.

https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=INS&division=1.&title=&part=2.&chapter=12.&article=1

74)     California Penal Code § 550(a)(1), (5) and (6) proscribe criminal penalties for actions that would constitute false claims under the False Claims Act.

75)     Violations of the California Penal Code §550 likewise violate the California Private Act . Cal. Ins. Code §1871.7(b).

76)     It is illegal to knowingly make false claims under a contract of insurance (Cal Pen. Code §550), and thus a violation of the California Private Act.  Cal. Ins. Code §1871.7(b)

77)     Violation of Cal. Ins. Code §1871.7(b) exposes the bad actor to a civil claim. Cal. Ins. Code §1871.7(d) & (e).

78)     Thus, incorrect cost reporting, and false claims, defraud private insurers and violate the California Private Act.

### 4. Nevada Medicaid Incentive Payment Program

79)     Nevada's Electronic Health Record Incentive Payment Program (the "Nevada Program") is set forth at http://dhcfp.nv.gov/Providers/Pl/EHRMain/.

80)     Nevada eligible hospitals must submit a "meaningful use" attestation.

http://dhcfp.nv.gov/uploadedFiles/dhcfpnvgov/content/Providers/Pl/MU%20Documentation%20

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

Reqs%20letter%20to%20EP%20v.8.pdf  That attestation includes compliance with meaningful usage, including compliant with core measures. *Id.*

81)     Nevada's glossary of terms defines "attestation" "[c]onfirmation by a provider that they have met the meaningful use standards. During the first year of incentive payments, eligible professionals and hospitals are allowed to provide attestation, or a confirmation of their compliance with the meaningful use standards. The state will verify the attestation when specific compliance criteria are developed."

http://dhcfp.nv.gov/uploadedFiles/dhcfpnvgov/content/Providers/PI/Glossary.pdf

82)     Nevada pays eligible hospitals under the Medicaid Incentive Payment Program, in part, based on the cost reports the hospital submits to Medicare.  State of Nevada, Dept. of Health and Human Services, Division of Healthcare Financing and Policy, "Eligible Hospitals – Registering and Participating in the Nevada Incentive Payments Program for Electronic Records".

http://dhcfp.nv.gov/uploadedFiles/dhcfpnvgov/content/Providers/PI/Eligible%20Hospital%20Registration%20and%20Participation.pdf, page 4.

83)     Thus, the cost reports impact the amount eligible hospitals receive under the Nevada Program. *Id.*

## IV.   **FACTUAL ALLEGATIONS**

84)     All of the medical items used by HCA in the course of treating patients are charged to the patient/payor. This is done through the use of the supply chain management and the billing systems.

85)     Included within the supply chain is every single piece of physical inventory HCA hospitals use ("Supply Chain").  Items range from cotton swabs to implantable medical devices.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

HCA's Division levels, rather than the individual hospital levels, manage the bulk of inventory issues, including when an item is used, where it is used, when it needs to be replaced, and how much it costs.

86)     Initially, inventory use is tracked through an electronic point of use system ("POU").  When a piece of inventory is needed, it is entered into the POU system, which then interfaces with the supply management and resource tracking ("SMART") system.  As described further below, items are then ordered (if not already physically present in inventory) through the SMART system.

87)     After a piece of inventory is used, it is charged to the patient/payor (either on an individual basis, or as part of a procedure).  This is accomplished through the use of three more tools, as follows.  First, the supply chain manager at each individual hospital runs a price change analysis ("PCA").  The PCA indicates price increases (but not decreases, as discussed below) in inventory.  Next, after an item is entered, and the PCA run, an automated markup takes place on items charged to patients ("Mark Up Factor").  The final step automatically takes the "marked-up" item and populates the system that charges patients ("Charge Master") and creates the patient charge amount ("Patient Charge Amount").

        a.     **HCA Supply Chain Management**

        1.     **POU (Point of Use)**

88)     As described above, HCA uses two different software programs to control its Supply Chain.  The first program is the POU, which literally tracks individual items used at the hospitals.  Supply Chain technicians and each individual hospital manage this system.  The second program is SMART.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

89)      Generally, a nursing director will approach a Supply Chain employee or email the Supply Chain Director to advise what item is needed to be added to their inventory list or PAR (periodic automatic replacement).  Once the item is added to the PAR, the Supply Chain technician places an order within the POU, which then interfaces with SMART.  SMART then prints out a paper requisition form if the item is stocked within hospital inventory.  If the item exists within the hospital inventory, the Supply Chain technician takes the item from inventory and gives it to the clinician who needs the item.  If the requisitioned item does not exist within hospital inventory, SMART will create a non-stock purchase order that will be sent to a vendor.

90)      Once the item arrives at the Hospital, the Supply Chain employee will deliver the requisitioned item to the Nursing Unit. The individual Clinician will utilize POU to scan this supply to the prospective Patient.  It is not uncommon for the Clinician to click on the wrong item in the POU database. Instead of correcting the error (and clicking on the proper item), there have been numerous instances when an individual Clinician sticks a patient identifier sticker and a sticker from the correct item onto a piece of paper to document the item actually used.  This creates an inconsistency in the database and makes it almost impossible to conduct any follow up with the patients for recalls or otherwise.

91)      SMART and POU interface electronically without need for user intervention.

**2.      SMART and Inventory Purchases**

92)      If the item is not in inventory at the individual hospital, SMART transmits the requisition to Division purchasing, initially located in Utah, and managed by April Horne.

93)      The Utah office contains two divisions, Mountain and Far West.  Ms. Horne manages purchasing for both.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

94)     Far West and Mountain Divisions purchasing department moved to Texas in 2015.  April Horne is the North Texas Division COO and still manages purchasing for Far West and Mountain.

95)     Once SMART forwards the information to Ms. Horne for review, Ms. Horne is responsible to ensure compliance with the individual vendor contract for that item.  The Division level actually purchases the item.

96)     SMART manages all of Corporate Defendants' Supply Chain and item pricing. SMART tracks all the physical items located in the HCA system. Items range from a cotton swab or a surgical tray, to a pacemaker, or other implantable devices.

97)     Supply Chain employees and each hospital's director of material management manually synchronize the SMART entries.

98)     For each Division, all of the hospitals within that Division share a SMART system.

99)     For every supply item, SMART tracks the quantity of each item on hand, each item's vendor, each item's invoices, the purchased quantity, the unit of measure ("UOM") and each item's cost.  By way of example, if a vendor invoiced Defendants $200 for a box of 100 items, the UOM would be 1 box and the cost per item would be $2.

100)    Within SMART, there is a price associated with each item.  The price should reflect the exact amount HCA paid for that item.

101)    SMART understands what inventory each hospital should have.  When an item is low, SMART automatically generates an electronic purchase requisition.

102)    Ms. Horne approves these electronic requisitions.  Once approved, the system generates a purchase order and sends it to the vendor.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

103)   The vendor ships the item and follows with an electronic invoice to accounts payable ("AP").  AP shows receipt and the price that was paid for the item.

### 3.   Price Changes in Inventory

104)   Throughout the year, Supply Chain item prices fluctuate. The item prices increase and decrease for varying reasons, based on the suppliers used and the suppliers' costs, among other things.  As discussed above, every time an item enters the Supply Chain, it is entered into SMART.

105)   Sometimes a Supply Chain item price decreases. This takes place for any number of reasons.  A decrease in price could occur because of a change in the market demand for the item, or because of a special price given to HCA because of HCA bulk purchases.

106)   Bulk purchases are made in order to get a discount (a "Rebate").

107)   HCA makes these bulk purchases through HealthTrust.  Notably, Health Trust also determines how and when to distribute Rebates to the various hospitals.

108)   Indeed, in order to obtain Rebates from vendors, HCA often mandates that Divisions purchase supply items in bulk quantities, even if the Division's hospitals do not need that item.

109)   As a Supply Chain manager, Relator Hurst frequently found himself with items in inventory that Alaska Regional did not need because they were not purchased at the hospital level, but rather at the Mountain and Far West Division level Supply Chains, and were sometimes the result of HCA bulk purchasing.

110)   Ultimately, the Corporate Defendants' vice president of the corporate Supply Chain, Brett Perkins located in Nashville, Tennessee, oversees decisions regarding purchasing Supply Chain items.  April Horne reports to him.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

**b. HCA Patient Billing System**

**1.    Charge Master**

111)    As discussed above, HCA's patient charge amount software is called "Charge Master." Charge Master is the software that produces patient charge amounts for billing, including Supply Chain items.

112)    Charge Master takes the item costs set forth in SMART, applies the Mark Up Factor for that item and determines the amount to charge each patient for Supply Chain items that patient uses – the Patient Charge Amount.

113)    This Patient Charge Amount is populated in the Charge Master database. The Patient Charge Amount is then billed to the patients or their payors.

**2.    Mark Up Factor Between SMART and Charge Master**

114)    Mark Up Factors are anywhere from 5 to 12 times the cost of the Supply Chain item.

115)    As Individual Defendant Hale explained to Relator Stanger, the Mark Up Factor is generally determined by patient sensitivity. In other words, if HCA determines that patients would be less sensitive to a high price for an item, that Mark Up Factor is larger. Conversely, if patients would be more sensitive to a high price, the Mark Up Factor is lower.

116)    The Mark Up Factor is not tied to any number or calculation. It is simply an algorithm in the SMART system that is based purely on what Defendants believe they can charge without eliciting payors' complaints.

117)    The Mark Up Factor is generally higher for less expensive items, and lower for more expensive items.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

### 3.   Yearly Markup

118)   Besides the sometimes-daily markup on Supply Chain Items, the Corporate Defendants also raise the Patient Charge Amount for Supply Chain items yearly, on October 1st.

119)   On October 1st, they increase the Mark Up for almost every item in the Supply Chain and enter the Mark Up into SMART.

120)   As Defendant Hale explained to Relator Stanger, this annual price change is approximately an eight percent (8%) increase for each Supply Chain item. Theoretically, this annual price change is meant to capture increases in the costs of Supply Chain items over the entire year.

121)   Defendant Hale told Relator Stanger the annual price change was the **only** time HCA updated its prices each year, in contravention of Defendants' actual policy of entering new prices in SMART every time the price of an item was raised.

122)   During an audit training meeting in Idaho Falls, Relator Stanger had a heated exchange with Defendant Hale wherein Defendant Hale reiterated that prices were updated only once a year. Relator Stanger explained he had done research (as discussed further below) that indicated patient charge amounts were changed every time a supply item invoices cost amount increases. Defendant Hale denied this, claiming that the patient charge amounts only change once per year. Defendant Hale told the group that Relator Stanger was interrupting the training, he was wrong, and he needed to stop his line of thinking. After the training, Relator Stanger brought the conversation back up with Defendant Hale and Paul Sutton. Relator Stanger told Defendant Hale that he and Mr. Sutton were doing weekly checks of charge amounts in Charge Master and were seeing the charges increase on a weekly basis. After about 10 minutes, Defendant Hale told Relator Stanger and Mr. Sutton that they were to discontinue their research

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

of the issue. Shortly thereafter, Defendant Hale and Defendant Tibbitts told Relator Stanger he had to move to Alaska to keep his job.

### c.    The Fraudulent Patient Charge Scheme

#### 1.    Price Change Analysis/ Mark Up Fraud

123)    As discussed above, within SMART, each hospital's director of materials management runs a PCA daily, analyzing the price changes for each item listed in SMART. PCA pulls the latest cost charged to HCA for each item and applies the Mark Up Factor to that item.

124)    Each time a PCA is performed it is sent to Individual Defendant Kim Christensen in the Utah office, the regional CEO of Far West and Mountain Divisions' Supply Chains.

125)    As a part of the PCA, the system prompts the hospital's director of materials management with an automated Yes/No question, asking whether only increases in price should be applied.

126)    HCA's policy is to give its employees explicit instructions to always answer "yes" to this question.  In other words, if the cost of an item actually goes down, that change in price is **never** reflected in PCA, and never transmitted to Charge Master.

127)    Indeed, Julie Brewer, market operations director, directly informed Relator Hurst that "we never go down in price, only up."

128)    As the final result of this explicit instruction and policy, Defendants never pass price decreases onto their patients, resulting in gross overcharging of patients/payors.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

### 2.    Patient Charge Amount Fraud

129)    As discussed above, Corporate Defendants' policy is to do a yearly markup on Supply Chain items, purportedly to capture the cost increases to the Corporate Defendants incurred over the year.

130)    Relator Stanger, as controller, discovered discrepancies within the synchronization process between SMART and Charge Master regarding the yearly markup, and began trying to identify the issues that caused this to occur.

131)    In order to do so, Relator Stanger downloaded the entire Charge Master file every Monday.

132)    Once he downloaded the Charge Master file, Relator Stanger would, each week, compare the amount set forth for various Supply Chain items that appeared in the Patient Charge Amount from one week to the next.  He was surprised to discover that prices varied week to week, given his explicit directive from Defendant Hale that prices were raised only once a year.

133)    Moreover, payors were also informed that prices were only raised once per year.

134)    While continuing his review, Relator Stanger was able to pull a field from the Charge Master that was called "Last Updated Date."

135)    If, as Relator Stanger had been informed, Supply Chain item prices were only changed once yearly, each "Last Updated Date" should have been the prior October 1st.  This, however, was not the case, thus proving that Defendants were frequently increasing the prices.

136)    Interestingly, although some items were being updated weekly, a few were not being updated at all.  When reviewing the Last Updated Date field, Relator Stanger discovered

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

that several items had not been updated for years, some even having a Last Updated Date as far back as 2003.

137)   As Stanger learned through his calculations and investigations, however, the items with older Last Updated Dates had been reported in SMART at a significantly higher price than those items actually cost and had been reported that way for years. Relator Stanger realized that this occurred because, while some item prices had decreased, some of the mandatory weekly price increases had actually outpaced the Mark Up Factor and annual eight percent (8%) increases.

138)   While Relator Stanger was reviewing the discrepancies, the Operating Room manager at Lakeview, Linda Vorhees, approached him.  She was outraged that patients were being overcharged for Supply Chain items. She brought this to the attention of both Relator Stanger and Wayne Dalton, Lakeview's then CFO.  This caused Relator Stanger to do an even more extensive investigation of the pricing issues.

139)   After Relator Stanger fully researched and understood the problem of over and underpricing, including the issue of only entering increased pricing into the Price Change Analysis, he presented his findings to Mr. Dalton.

140)   Stanger informed Mr. Dalton that this problem was affecting over one-thousand, two hundred (1,200) items.

141)   Mr. Dalton initially responded that, "We need to get these fixed."  Mr. Dalton also said, "the last thing we need is for the local media to get wind of this."

142)   Mr. Dalton passed this information to the Division Supply Chain management, Division CFO, Individual Defendant Tibbitts.  Mr. Dalton then set up a meeting with Relator Stanger, Dalton, Individual Defendant Hale, and Individual Defendant Tibbitts.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

143)     On December 4, 2018, Relator Stanger spoke with Individual Defendants Tibbitts and Hale, and informed them of a simple fix. Relator Stanger told them that Supply Chain employees merely needed to answer the Price Change Analysis prompt "No," thus providing an accurate reflection of both increases and decreases in the prices of Supply Chain items.

144)     Relator Stanger further stated that he could fix the problem with one keystroke and that the problem was at least Division-wide, given that the Supply Chain reported at a Division level.

145)     Individual Defendant Tibbitts stopped the conversation, stating "We can't make this change at other hospitals because it will decrease our division gross revenue numbers and have a potential impact on our stock price."

146)     Individual Defendant Tibbitts further stated that they would not fix all the errors, but that Individual Defendant Tibbitts would only allow Relator Stanger to manually correct any Supply Chain item where the discrepancy cost a patient over $1000, and further, that this would only be fixed on a going forward basis, so that any patients already overcharged would not be reimbursed for the overage.

147)     Soon thereafter, Relator Stanger was informed that Corporate Defendants would only fix a small number of items – 171 to be exact.

148)     Further, Julie Brewer specifically instructed Kelly Anderson, the Lakeview Hospital Material Management Director, not to change the instruction to always answer "Yes" to the Price Change Analysis prompt.

### 3.     Unit of Measure Discrepancies

149)     While performing his extensive Supply Chain item analysis, on multiple occasions, Relator Stanger found Supply Chain items that had a UOM error in the original set up

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

on SMART.  SMART often had a UOM listed instead of the individual item, and therefore the cost amount in the algorithm that came up with the Patient Charge Amount was significantly larger than it should have been.  For example, in an instance where a box of 100 items cost $200, each item should be listed at $2.  However, the item was frequently listed at $200.   Thus, the Mark Up Factor and the 8% yearly increase was applied to $200 instead of $2. If the Mark Up Factor was 8x, the Patient Charge Amount was $1,600 when it should have been $16.

150)    Relator Stanger attempted to correct several such errors in SMART, but due to HCA's policy of only entering price increases and not decreases, he was unable to correct the Patient Charge Amounts if the correct amount was actually lower than the amount contained in Charge Master.

**d.    Supply Chain Records Issues**

151)    Starting in 2017, Relator Hurst discovered Supply Chain issues besides overpricing.  Specifically, documents revealed an absence of lot numbers (UDIs) for all items placed inside the body, or the recording of improper lot numbers for those items.

152)    Josh Kimpton served as the catheter lab materials manager at Alaska Regional during the relevant period.  He reported to Relator Hurst.  He tracked the inventory and supplies the providers used on their patients.  His reports revealed a tremendous number of omissions, mischarges or other issues pertaining to stents and other devices placed in the bodies of the hospital's patients.

153)    In March 2018, Relator Hurst made Defendant Jill Birdsong, Alaska Regional's new CFO, aware of the issues in the catheter lab Supply Chain, specifically the recording of different stents than those used.  Individual Defendant Birdsong stated that she was alarmed.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

154)    Some months later, in May 2018, however, Individual Defendant Birdsong and Individual Defendant Tibbitts (who flew to Alaska specifically for the meeting) told Relator Hurst that the prices of the different stents are similar, so the errors caused no harm.  Although there may have been no economic harm to the patient, tremendous risk to the patients exists as a result of these repeated mistakes.

155)    Absent accurate information, Corporate Defendants have no way to follow up with patients to determine if a medical device has caused an injury or death, or if a recall had been issued on a particular device which warrants patient contact.

156)    Relators repeatedly attempted to sound the alarm bells regarding the deficiencies in the Supply Chain tracking systems and the risk to patient safety that resulted from those deficiencies.

157)    Defendants ignored Relators' warnings.

**e.      Defendants Ensured that they Would Not Suffer Even Extremely Minor Losses**

158)    Despite the fact that Corporate Defendants would not allow Relators to correct the massive overcharges to patients and the government, Defendants spent hundreds of hours making sure that patients were never undercharged.

159)    After Josh Kimpton informed Relator Hurst that there were issues with the stents being reported as used in the catheter lab, Relator Hurst directed Kimpton to do a thorough review of Supply Chain items in the clinical system, as well as in the POU and SMART systems.

160)    This review yielded many items where the pricing had been input incorrectly into the various systems, causing massive overcharges and including some very few instances where Corporate Defendants had actually been undercharging for Supply Chain items.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

161)    Additionally, Mr. Kimpton had an extensive discussion with HealthTrust regarding how to account for Rebates when inputting Supply Chain item pricing into the various systems.  Ultimately, this issue was not resolved.

162)    Relator Hurst sent this information to his supervisor, and, eventually, an audit was performed of Alaska Regional, wherein the auditors determined that patients had not been charged enough for certain Supply Chain items for a total of $1600 in undercharges.  The audit report made no mention whatsoever of the overcharges.

**f.      False Cost Reports Skew Medicare/Medicaid Incentive Payment Program Payments.**

163)    The cost reports provide one of the factors on which the payments under the various incentive payment programs are calculated.

164)    If the cost reports are false and state much higher costs than actually expended, then the amounts the eligible hospitals are reimbursed under those programs will be falsely inflated.

**g.      Retaliation against Relators.**

165)    Sometime after Relator Stanger's meeting with Defendant Hale and Individual Defendant Tibbitts, they told him he had to move to Alaska or lose his job, even though he had been working remotely for years.

166)    During this time period, the audit discussed above was initiated at Alaska Regional.  Relator Stanger discussed his findings with the auditor, who then reported the issues with PCA and Charge Master to his manager.

167)    Eventually, Relator Stanger was terminated from his position, purportedly because he refused to move to Alaska.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§
3730(b), *et seq.*

168)    During the same time period, Relator Hurst discovered the discrepancies in the Supply Chain systems and brought up these to the director of the department and manager of catheter lab.  He received no response.

169)    He then met with the new CFO of his division, Defendant Tina Miller, and gave her all of the information, repeatedly asking her what was going to be done.

170)    Eventually, months later, Individual Defendant Tibbitts flew to Alaska to discuss the issues.

171)    At this point, the audit discussed above was initiated.

172)    After the audit, Relator Hurst was informed that the problems "discovered" in the audit., *i.e.*, the $1600 in undercharges, would be ascribed to a Supply Chain failure.

173)    In trying to elevate this issue within the company, Relator Hurst had several conversations, including with Hardy Farris, of the Internal Audit team, Individual Defendant Birdsong, Dan Goff, and Joshua Kimpton, as well as the Revenue Integrity team. His conversations with Individual Defendant Birdsong were extremely hostile, including with her swearing at him and calling him "stupid." These conversations continued over the following months. At one point, during an earthquake, Individual Defendant Birdsong made demands of Relator Hurst, who explained that his team was recovering from the earthquake that happened only a half hour prior. She responded by questioning his leadership and military credentials. Relator Hurst continued to be harassed about "his" failures, including directing him to come up with a plan to improve, until he finally left.

## V.    **CONCLUSION**

174)    Relators came upon Defendants' Supply Chain item fraud being committed from different paths.  Nonetheless, the fraud both Relators witnessed ultimately had the same end,

massively overcharging patients and the Government for Supply Chain items, in contradiction to their certifications to CMS.

175)     Patients, and payors were repeatedly and purposely overcharged for these items, sometimes by more than 830% of the amount charged to Defendants.

176)     Defendants knowingly committed these frauds, and, indeed, made sure that the fraud continued, even after repeated discussions with Relators.

177)     Defendants' fraud increased the payments they received under the Medicare and Medicaid Incentive Payment Programs.

178)     Defendants' fraud cost patients and the Government millions of dollars over many years.

**Count I.**

**Violations of the Federal False Claims Act**
**(31 U.S.C. § 3729 (a)(1)(A))**
**Presenting False Claims for Payment**

179)     The United States realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

180)     The United States seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

181)     Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in connection with the submission of their requests for reimbursement under the Medicare and Medicaid programs.

182)     Defendants caused the United States to reimburse Medicare and Medicaid funds under the Medicare program because of their fraudulent conduct.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

183)    By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

### Count II.

### Violations of the Federal False Claims Act
### (31 U.S.C. § 3729 (a)(1)(B))
### Use of False Statements

184)    The United States realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

185)    The United States seeks relief against Defendants under Section § 3729(a)(2) of the False Claims Act, 31 U.S.C. 3729(a)(1)(B).

186)    Defendants knowingly made, used, or caused to be made or used, false records or statements material to false and fraudulent claims, in connection with the submission of its requests for reimbursement under the Medicare and Medicaid programs.

187)    Defendants caused the United States to reimburse Medicare and Medicaid funds under the Medicare and Medicaid program because of their fraudulent conduct.

188)    By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

### Count III.

### Violations of the Federal False Claims Act
### (31 U.S.C. § 3729 (a)(1)(G))
### Use of False Statements

189)    The United States realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

190)    The United States seeks relief against Defendants under Section § 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

36

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

191)   Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in connection with the submission of their requests for reimbursement under the Medicare and Medicaid programs.

192)   Defendants caused the United States to reimburse Medicare and Medicaid funds under the Medicare and Medicaid programs because of their fraudulent conduct.

193)   By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

## Count IV.

### Violations of the Federal False Claims Act
### (31 U.S.C. §3729(a)(1)(C))
### Conspiracy to Commit a Violation

194)   The United States realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

195)   The United States seeks relief against Defendants under the False Claims Act, 31 U.S.C. 3729(a)(1)(C).

196)   Defendants conspired to defraud the Government by getting false or fraudulent claims allowed or paid.

197)   Defendants acted knowingly, with deliberate ignorance, or with reckless disregard for the truth in making and using, or causing to be made and used, false records and statements, in order to get false or fraudulent claims paid or approved by the United States in connection with the submission of its requests for reimbursement under the Medicare, Medicaid and other federal healthcare programs.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

198)   As a result of Defendants' false statements, Defendants obtained payments from the United States for supplies at significantly overinflated prices.

199)   By reason of Defendants' conspiring to commit a violation of 31 U.S.C. § 3729 (a)(1)(A), (B) and (G), the United States has been damaged in a substantial amount to be determined at trial.

## Count V.

### Violations of the Alaska False Claims Act

200)   The State of Alaska realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

201)   The State of Alaska seeks relief against Defendants under the Alaska False Claims Act, AS 09.58.0210.

202)   Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to Alaska, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to Alaska in connection with the submission of their requests for reimbursement under the Medicaid program.

203)   Defendants caused Alaska to reimburse Medicaid funds under the Medicaid program because of their fraudulent conduct.

204)   By reason of Defendants' false claims, Alaska has been damaged in a substantial amount to be determined at trial.

///

///

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

**Count VI.**

**Violations of the California False Claims Act**

205)   The State of California realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

206)   The State of California seeks relief against Defendants under the California False Claims Act.

207)   Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to California, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to California in connection with the submission of their requests for reimbursement under the Medicaid program.

208)   Defendants caused California to reimburse Medicaid funds under the Medicaid program because of their fraudulent conduct.

209)   By reason of Defendants' false claims, California has been damaged in a substantial amount to be determined at trial.

**Count VII.**

**Violations of the California Insurance Claims Fraud Prevention Act**

210)   The State of California realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

211)   The State of California seeks relief against Defendants under the California False Claims Act.

212)   Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to California insurers,

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to California insurers in connection with the submission of their requests for reimbursement to insurers.

213)     Defendants caused insurers to reimburse funds because of their fraudulent conduct.

214)     By reason of Defendants' false claims, California insurers have been damaged in a substantial amount to be determined at trial.

## Count VIII.
### Violations of the Nevada False Claims Act

215)     The State of Nevada realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

216)     The State of Nevada seeks relief against Defendants under the Nevada False Claims Act, Nev. Rev. Stat. § 357.040 (1)(a)-(i).

217)     Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to Nevada, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to Nevada in connection with the submission of their requests for reimbursement under the Medicaid program.

218)     Defendants caused Nevada to reimburse Medicaid funds under the Medicaid program because of their fraudulent conduct.

219)     By reason of Defendants' false claims, Nevada has been damaged in a substantial amount to be determined at trial.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

**Count IX.**

**Violation of the Federal False Claims Act
(31 U.S.C. § 3730(h))
Retaliation Against Relator Stanger**

220)     Relator Stanger realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

221)     Relator Stanger investigated and advised Defendants of the false and fraudulent claims being presented by Defendants.

222)     Relator Stanger's investigation involved matters which were, or were reasonably likely to be, viable actions under the False Claims Act.

223)     Defendants had explicit or implicit knowledge of Relator Stanger's protected activity.

224)     Defendants eventually terminated Relator Stanger for his actions.

225)     By reason of Defendants' acts and conduct, Relator Stanger has been damaged in a substantial amount to be determined at trial.

**Count X.**

**Violation of the Federal False Claims Act
(31 U.S.C. § 3730(h))
Retaliation Against Relator Hurst**

226)     Relator Hurst realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

227)     Relator Hurst investigated and advised Defendants of the false and fraudulent claims being presented by Defendants.

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

228)   Relator Hurst's investigation involved matters which were, or were reasonably likely to be, viable actions under the False Claims Act.

229)   Defendants had explicit or implicit knowledge of Relator Hurst's protected activity.

230)   Defendants constructively terminated Relator Hurst by creating a hostile work environment after his disclosure of the results of his investigation.

231)   By reason of Defendants' acts and conduct, Relator Hurst has been damaged in a substantial amount to be determined at trial.

**Request for Relief**

WHEREFORE, Plaintiffs, the United States, the State of Alaska, the State of California, and the State of Nevada, *ex rel.* Kelvin Chris Stanger and John Hurst request that judgment be entered in their favor and against Defendants as follows:

(a)   On the First, Second, Third and Fourth Claims for Relief (Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a) (1) for treble the United States' damages, in an amount to be determined at trial, and a penalty for each false claim presented;

(b)   On the First, Second, Third and Fourth Claims for Relief, awarding Relators Stanger and Hurst their relator's share pursuant to 31 U.S.C. § 3730(d);

(c)   On the First, Second, Third and Fourth Claims for Relief, an award of costs and attorney's fees pursuant to 31 U.S.C. § 3730(d);

(d)   On the Fifth Claim for Relief, for treble Alaska's damages, in an amount to be determined at trial, and a penalty for each false claim presented; awarding Relators Stanger and Hurst their relator's share pursuant to the Alaska False Claims Act; an award of costs and attorney's fees;

42

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

(e)     On the Sixth Claim for Relief, for treble California's damages, in an amount to be determined at trial, and a penalty for each false claim presented; awarding Relators Stanger and Hurst their relator's share pursuant to the California False Claims Act; an award of costs and attorney's fees;

(f)     On the Seventh Claim for Relief, for treble each claim for compensation, and a $10,000 penalty for each false claim presented; awarding Relators their relator's share pursuant to the California Insurance Fraud Prevention Act; an award of costs and attorney's fees;

(g)     On the Eighth Claim for Relief, for treble Nevada's damages, in an amount to be determined at trial, and a penalty for each false claim presented; awarding Stanger and Hurst their relator's share pursuant to the Nevada False Claims Act; an award of costs and attorney's fees;

(h)     On the Ninth Claim for Relief, awarding Relator Stanger such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including:

(1)     two times the amount of back pay with appropriate interest including pre- and post-judgment interest;

(2)     compensation for special damages, including damages for emotional distress, sustained by Relator Stanger in an amount to be determined at trial;

(3)     litigation costs and reasonable attorney's fees; and

(4)     such punitive damages as may be awarded under applicable law;

(i)     On the Tenth Claim for Relief, awarding Relator Hurst such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including:

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b), *et seq.*

(1)    two times the amount of back pay with appropriate interest including pre-

and post-judgment interest;

(2)    compensation for special damages, including damages for emotional

distress, sustained by Relator Hurst in an amount to be determined at trial;

(3)    litigation costs and reasonable attorney's fees; and

(4)    such punitive damages as may be awarded under applicable law; and

(j)    Awarding such further relief as is proper.

**JURY TRIAL IS DEMANDED.**

Dated:  April 13, 2021

By: _____
        Emily Nugent

EMILY NUGENT LAW
935 Moraga Road, #200
Lafayette, CA 94549
emily@emilynugentlaw.com
510 371 4456

-and-

PLATTNER VERDERAME, PC
Nick Verderame (*pro hac vice* pending)
316 E. Flower St.
Phoenix, AZ 85102
nverdarame@pvazlaw.com
602 899 2431

-and-

FISCHER LEGAL GROUP
Andrea Fischer (*pro hac vice* pending)
Audrey Schechter (*pro hac vice* pending)
305 Broadway, Suite 742
New York, NY 10007
afischer@fischerlegalgroup.com
audreyschechterlaw@gmail.com
212 328 0142
*Attorneys for Relators*

44

COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§
3730(b), *et seq.*